IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 12, 2024 at Jackson

## JOHN MONZELL BANKS v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Montgomery County**
**No. 63CC1-2017-CR-925  William R. Goodman, III, Judge**

_____

### No. M2024-00073-CCA-R3-PC
_____

The petitioner, John Monzell Banks, appeals the denial of his petition for post-conviction relief, arguing the post-conviction court erred in finding he received the effective assistance of counsel at trial.  Following our review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and MATTHEW J. WILSON, JJ., joined.

Daniel P. Ufford, Clarksville, Tennessee, for the appellant, John Monzell Banks.

Jonathan Skrmetti, Attorney General and Reporter; Katherine C. Redding, Senior Assistant Attorney General and Christian N. Clase, Assistant Attorney General; Robert J. Nash, District Attorney General; and Kayla M. McBride, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### *Facts and Procedural History*

This case stems from the petitioner's involvement in a home-invasion / robbery with three other individuals on the night of October 3, 2016, during which one person in the home was shot and robbed, other individuals in the home were robbed, and miscellaneous belongings were stolen from the home.  *State v. Banks*, 2020 WL 5015888, at *1-5 (Tenn. Crim. App. Aug. 25, 2020), *perm. app. denied* (Tenn. Dec. 2, 2020).  The underlying facts were summarized by this Court on direct appeal as follows:

Officer Kevin Westover of the Clarksville Police Department testified that at approximately 11:31 p.m. on October 3, 2016, he responded to a home invasion call at 2162 Blakemore Drive. He stopped approximately two to three houses from the residence and turned off his emergency lights and sirens in order to avoid detection by the suspects. Officer Westover and Officer George Goodman approached the house and saw that the front door was ajar, and they could see inside the home. They also encountered a man who said that he had been shot. Officers Westover and Goodman conducted a protective sweep of the home and spoke with other individuals in the residence. One of the individuals said that there were three suspects who left out the side door. The house looked as if it had been ransacked. Officer Joshua Godwin also arrived at the scene. He saw a dark colored four-door vehicle parked three or four houses down from 2162 Blakemore Drive. Officer Jennifer Renken testified that she found a set of keys on a pallet outside in the backyard. A revolver was also found behind a fence in the backyard.

Regina Hayes, a resident of Blakemore Drive, testified that she has a security system and observed a car driving "back-and-forth" down the road on October 3, 2016. The car stopped at her neighbor's house and parked under the street light. Ms. Hayes testified that she saw four individuals exit the car wearing hoodies, and they walked past her house to another house. She did not recognize any of the individuals. Ms. Hayes called police, and she gave them a copy of the surveillance video.

Demarkus Brown testified that he was at Antonio Atkins' residence on October 3, 2016, along with Towanna Atkins, Shaunon Hill, Dasian Hill, and two children, ages nine and three. Sometime after 11:00 p.m., Mr. Brown was lying on the couch when he heard something at the front door. He said that Ms. Atkins was outside smoking, and everyone else was in bed. Mr. Brown stood up and heard additional noises. The door opened, and he heard someone order him to get down. He was then shot in the stomach. Mr. Brown testified that three men came into the residence and began rummaging through everything and flipping the couches. Mr. Brown remembered that the men were wearing ski masks, and some of them were dressed in black. He noted that one of the men was wearing an orange ski mask. Mr. Brown testified that the men asked him where the money and Mr. Atkins were located. He further testified that two of the men, who were armed, stood over him and one said, "Give me everything you got in your pockets." The two men took Mr. Brown's cell phone and his wallet containing forty dollars.

Mr. Brown testified that the three men left the residence through the side door when police sirens were heard. He did not know any of the individuals.

Mr. Brown was taken to Vanderbilt Medical Center after the shooting, where he remained for three months and underwent significant medical treatment because his injuries were life threatening. He had to wear a colostomy bag for a period of time. He testified the bullet is still lodged in his spine and cannot be removed, because he faces a fifty-percent chance of paralysis if he were to undergo a procedure to remove the bullet. Mr. Brown has continued to experience daily problems as a result of his injuries.

Towanna Atkins, Antonio Atkins' sister, testified that she was walking into the kitchen when the three individuals broke into Mr. Atkins' house. She said, "I heard a boom and a popping sound, and I just heard everybody start saying, 'Get on the ground.'" Ms. Atkins testified that a man with a gun who "had something over his head and [ ] something red covering his face" came into the kitchen and held the gun to her head and ordered her to get down on the kitchen floor. She saw a total of three men in the residence, and one of them was approximately five feet nine inches tall, wearing a hoodie and had something covering his face. The two other men also had masks covering their faces. Ms. Atkins heard one of the men ask Mr. Brown "[w]here's A.K." and "[w]here's the money?" Another man asked if there were any shoes in his size. Ms. Atkins testified that the men ran past her to the side door, and someone said: "They're coming" or "Are they outside." She said that her keys and cell phone were taken from the table, and the men placed clothing, shoes, and other things from the closets into garbage bags. Ms. Atkins did not recognize the men.

After the three men left the house through the side door, Mr. Brown told Ms. Atkins that he had been shot. By the time that she got into the living room with a towel, the police had arrived. Ms. Brown noted that everything was pulled out of the closet next to the front door, and the living room was a "complete mess." She testified that everything was also pulled out of the hallway closet, and the first bedroom, where Ms. Shaunon Hill slept, was also ransacked. The bathroom was also a mess.

Shaunon Hill testified that on the night of the shooting, she was in bed playing a game on her phone when she heard a "big loud boom" sometime between 10:30 and 11:00 p.m. She then heard a gunshot and someone say, "Get down. Get down. We [sic] looking for money." Ms. Shaunon Hill thought that she heard two voices. She testified that two men came into her

bedroom, and she saw two additional men in the hallway. Ms. Shaunon Hill remembered that the men had their heads covered with a hat or scarf, and their faces were covered. One of the men, who was wearing gloves, pointed a gun at her forehead and ordered her to get on the floor. Ms. Shaunon Hill testified that the second man who entered the room had a scarf on his face and ransacked the room asking her where the money was located. She told the men "[t]his is nana's room. There's no money in here." Ms. Shaunon Hill testified that she was very frightened. She said that one of the men in the hallway also had a gun and was rummaging through the closet outside of her door. Ms. Shaunon Hill testified that one of the men asked her what was at the back of the house, and she informed the man that her grandchildren were back there and that he was not "going to go mess with them." The man agreed not to bother the children, and Ms. Shaunon Hill told them to "get what you going to get and get out." She said that the men began gathering white trash bags that they had filled with shoes and other items from the house. Ms. Shaunon Hill testified that the men did not take anything from her, and she called 911 after they left the room and ran out of the house. While she was on the phone, Mr. Brown told her that he had been shot. Ms. Shaunon Hill did not recognize any of the men who entered the house.

Ms. Dasian Hill testified that she was living with Antonio Atkins on October 3, 2016. She and Mr. Atkins were in bed when she was awakened by a "kick on the door" and a gunshot. Ms. Dasian Hill walked out of the bedroom and saw two black males wearing face coverings entering the house through the front door. She remembered seeing an orange bandanna and a black face mask. One of the men had "twists" in his hair. Ms. Dasian Hill ran back into the bedroom, called 911, woke Mr. Atkins, and got into the closet while remaining on the line with the dispatcher until police arrived. Ms. Dasian Hill testified that the men attempted at some point to enter the bedroom but she and Mr. Atkins held the door closed by pushing a dresser against the door. Ms. Dasian Hill heard the men repeatedly shouting, "Where the money at? Where he at?" She did not recognize either of the men in the house.

Antonio Atkins testified that he was also awakened by a loud boom, and someone kicking in the front door. Ms. Dasian Hill then ran into the bedroom and said that someone was trying to break-in the house. Mr. Atkins shut the door, and held it shut. A few seconds later he heard a gunshot. Mr. Atkins did not have any contact with the men who entered the house. He noted that the clothing, shoes, and car keys taken from the residence belonged to him. Most of his belongings were later recovered.

- 4 -

Officer Gary Mefford of the Clarksville Police Department testified that he and his K-9 partner, Leo, responded to the home invasion on Blakemore Drive. Officer Mefford was advised of the direction in which the suspects fled by other officers on the scene. Leo led Officer Mefford to a chain link fence in the backyard where there were some pallets with glass stacked on top of them. Officer Medford testified that Leo "began to nose at the pallets," and Officer Mefford discovered two sets of keys. Leo then attempted to go through the bottom of the chain link fence, and Officer Mefford discovered a revolver on the other side of the fence. Officer Mefford testified that he moved Leo to the other side of the fence, and the dog continued tracking to the gate leading to the front yard where Officer Mefford discovered a blaze orange ski mask. Leo continued to track down the street from where the mask was located, parallel to Briarwood Drive. Officer Mefford and Leo reached the corner residence, and Leo "nosed" on a Nike shoebox on the ground. Leo continued tracking and traveled into the direction of the suspects' car and back toward the victim's house.

Leo eventually led Officer Mefford to a hill where Leo retrieved a t-shirt. Officer Mefford took the shirt and placed it back on the ground. Leo then made a left turn and traveled into the woods where he located a baseball cap lying on the ground. Officer Mefford and Leo continued down a path and through a creek bed and a couple of fences. They turned right, adjacent to Whitfield Road, and went through the woods. Leo slowed down and lifted his head, which indicated that he sensed "fresh human odor [that] is foreign to the terrain." Officer Mefford testified that Leo began to circle and pulled to the left where he located a pair of tennis shoes. At that point, Leo was exhausted, and Officer Mefford returned to the scene to give Leo water and allow him to rest. All of the items found by Leo were collected by other officers. Officer J.T. Knoblock of the Clarksville Police Department testified that he had the suspects' vehicle transported to the police department's evidence lot.

At the time of the offenses, Julian Mize lived in a house on Briarwood Drive that was located directly behind a house on Blakemore Drive. He noted that the backyard of the two homes shared the same fence and that Briarwood Drive was a loop that ran parallel to Blakemore Drive where the victims' house was located. At some point after October 3, 2016, Mr. Mize found a cellular phone under the fence in the corner of his and his neighbor's yard. He eventually took the phone to the Clarksville Police Department and gave it to an officer.

Kevonte White was twenty-years-old at the time of trial, and he had known [the petitioner] since before they were in high school. He agreed that he pled guilty to three counts of aggravated robbery and was serving his sentence for the crimes at issue in this case. Mr. White testified that he and two other individuals went to Antonio Atkins' residence on the October 3, 2016, because the victim owed him some money. He said that they rode to the house in a black, four-door sedan but he did not know who owned the car. Mr. White testified that he kicked the door in and entered the house. He could not remember if anyone else entered the house. Mr. White testified that there was a gunshot but he did not know who fired the shot. He claimed that he could not really remember the events of what happened that night. Mr. White testified that he knew someone called "Rico" but he did not know if the person's name was actually Brandon Berry.

Detective Carlton testified that the two sets of keys found on the stack of pallets behind the victims' residence belonged to Antonio Atkins and Towanna Atkins. The cell phone found by Mr. Mize also belonged to Ms. Atkins, and Detective Carlton returned it to her. Detective Carlton testified that the .38 caliber revolver found on the other side of the fence behind the house was loaded. He retrieved the surveillance video from the victims' neighbor, Regina Hayes, which showed the suspects' vehicle drive past her house and stop. The car was later found down the street by police. There were also four individuals seen on the video.

Detective Carlton testified that the car was registered to Brandon Berry, a.k.a. "Rico." Detective Carlton searched the vehicle and interviewed Mr. Berry. He collected a blue and orange stocking cap, a cell phone, and a Powerade bottle from the vehicle. The cell phone belonged to [the petitioner] but was registered to [the petitioner]'s mother. Detective Carlton obtained a warrant and searched the contents of the phone. He said that there were several "selfie videos" on the phone of [the petitioner] rapping while wearing an orange cap. The videos were recorded a few hours before the robbery.

Detective Carlton interviewed [the petitioner] on March 13, 2017. [The petitioner] identified his co-defendants: Kamari Wilson, Damari Moore, and Kevonte White from photographs that Detective Carlton showed him. Detective Carlton testified that [the petitioner] admitted to going to the victims' residence and possessing the gun that was found in the backyard. [The petitioner] told Detective Carlton that he and the other individuals went to the victims' residence to get money from Antonio Atkins. There was also

- 6 -

talk during the interview about a pair of Nike "Yeezy" shoes that was dropped by Ms. Wilson. Detective Carlton noted that a pair of Yeezy shoes was found in some nearby woods after the robbery. [The petitioner] said during the interview that Mr. Wilson told [the petitioner] that he had lost his shoes. Detective Carlton testified that he took a buccal swab from [the petitioner] for DNA comparison.

The transcript of the [the petitioner]'s interview with Detective Carlton was introduced as an exhibit at trial. During the interview, [the petitioner] stated that Mr. White and a man from Detroit called and asked [the petitioner] to do something, and [the petitioner] agreed. The victim owed the man from Detroit some money. [The petitioner] admitted that he, Mr. White, Mr. Wilson, and Mr. Moore pulled up to a house, and "it happened." He said that Mr. Moore fired the first shot, and he could not recall who kicked in the door. [The petitioner] claimed that he stood at the front door and did not touch anything. He denied having a shotgun but admitted that he had a .38 caliber gun. [The petitioner] said that Mr. Moore had a .22 caliber weapon or another small gun. He also said that one of his accomplices took eighty dollars from the woman in the kitchen and one-hundred twenty dollars from the man who was shot. [The petitioner] denied that he was wearing an orange mask during the robbery but recalled that he was wearing a black hood. He said that he saw police arrive on the scene with their lights off. [The petitioner] said that he jumped the fence without the gun because he feared shooting himself. He admitted that Mr. Moore yelled out [the petitioner]'s and Mr. White's names. [The petitioner] said that he and his co-defendants split up to flee the scene.

Dr. Christina Wells is employed by the Tennessee Bureau of Investigation (TBI) Forensic Biology Unit and is an expert in serology and DNA identification. She examined the orange mask located at the scene in this case. Dr. Wells testified that the DNA profile obtained from a stained area on the mask was "consistent with a mixture of at least four individuals, including at least one male." She further testified that "[d]ue to the limited profile obtained and an unknown number of potential contributors to the profile, interpretation was inconclusive for the stained area." Dr. Wells testified that the DNA profile obtained from the area of the mask around the eyes, nose, and mouth was also consistent with a mixture of at least four individuals, and the "major contributor profile" of DNA matched that of [the petitioner]. The minor contributor profile was inconclusive.

On cross-examination, Dr. Wells testified that she also tested a revolver. The results of DNA on the weapon revealed a mixture of at least four individuals as well. An unknown male was the major contributor of the DNA on the weapon.

*Id.*

As a result of his involvement, the petitioner was convicted of two counts of aggravated robbery, and one count each of especially aggravated robbery, aggravated burglary, and possession of a firearm during the commission of a dangerous felony, and the trial court imposed an effective sentence of twenty-four years' confinement. *Id.* at *1. On direct appeal, this Court affirmed in all regards except for one of the aggravated robbery convictions, which this Court dismissed due to lack of evidence that property was taken from the victim named in that count of the indictment. *Id.* at *11. The petitioner's sentence was unchanged by the dismissal. *Id.* at *1.

The petitioner filed a timely pro se petition for post-conviction relief, and an amended petition was subsequently filed by appointed counsel. In his petitions, the petitioner specifically asserted that trial counsel was ineffective because she did not strike a juror the petitioner knew and with whom once had "a big disagreement." The petitioner also averred that counsel's representation was "wholly ineffective," which he expounded on at the hearing to be based on counsel's lack of investigation, preparation, and communication.

At the post-conviction evidentiary hearing, trial counsel testified that she represented the petitioner at trial and sentencing, but she did not represent him on appeal. Counsel did not recall having any issues obtaining discovery in the case. Counsel reviewed the discovery, including the co-defendants' and the petitioner's interviews with police. However, counsel did not visit the crime scene or do any outside investigation into the co-defendants.

Counsel did not recall how many times she met with the petitioner in preparation for trial but remembered meeting with him at her office "on more than one occasion" and possibly also at the jail. Counsel and the petitioner additionally met every time "there was a court date" and "met every day" during trial. During their conversations, counsel "discussed all the evidence," particularly the evidence that was "problematic" for the petitioner's case. Counsel's "main concern" was the petitioner's confession, which counsel moved to suppress. Counsel did not remember the petitioner raising any other issues of concern to her.

Counsel recalled that during voir dire, the petitioner told her that he and one of the potential jurors, Mr. Gonzalez, went to school together. The transcript from voir dire showed that under questioning by the State, Mr. Gonzalez admitted that he and the petitioner "went to middle school together" and were "kind of" friends in school. However, Mr. Gonzalez said that he had no contact with the petitioner since then and believed he could still be fair and impartial.

Counsel asked the petitioner if he wanted to strike Mr. Gonzalez, but the petitioner said that "[h]e did not." In fact, the petitioner told counsel that he "preferred to leave Mr. Gonzalez on the jury" and "thought that it would, actually, be a positive" to have a similarly aged young male on the jury. Counsel did not think their prior relationship would taint the jury because it appeared to be "a friendly relationship" by all accounts. "If Mr. Gonzalez had indicated that he disliked [the petitioner] or [the petitioner] had indicated . . . that they had a bad history, then . . . [counsel] would have had a problem with it." In addition, counsel explained that her normal procedure during voir dire was to create a list of jurors she wanted to strike, as well as ask her client if he or she had concerns with anyone or "would like to strike for any reason," and after discussion they would "come up with a strike list together." Counsel said that nothing came up during voir dire that led her to believe Mr. Gonzalez "could not be fair or impartial."

The petitioner testified that he and counsel had two meetings during the time he was out of jail, the initial meeting and a second one "before [he] went to trial." The petitioner recalled meeting with counsel another time at the jail. The petitioner had the opportunity to review the discovery provided to him by counsel but did not go over the material with counsel. The petitioner did not have any discussions with counsel about his confession to the police, although he acknowledged counsel conducted a suppression hearing attempting to keep the confession out.

The petitioner stated that he was concerned with Mr. Gonzalez being on the jury because they "went to school together, and . . . kind of had a bad falling out" over something related to Mr. Gonzalez's brother. The petitioner said he expressed his concerns to counsel, stating "we should take him off the jury . . . selection." However, counsel told the petitioner not to "waste one of your picks taking him off, because the D.A. is going to take him off." When the district attorney did not strike Mr. Gonzalez, the petitioner admittedly did not talk to counsel again about his desire to strike the juror. The petitioner acknowledged that Mr. Gonzalez admitted he knew the petitioner but also stated he could still be fair and impartial.

The post-conviction court denied the petition, determining the petitioner failed to prove that counsel rendered ineffective assistance. The petitioner filed an untimely notice of appeal, but this Court waived the timely filing requirement.

## *Analysis*

On appeal, the petitioner asserts that he received ineffective assistance of counsel because counsel failed to: (1) "effectively communicate . . . which caused a lack of effective preparation" and (2) remove a "clearly biased" juror with whom the petitioner had a previous conflict. The petitioner further asserts that the "cumulative effect of trial counsel's ineffective assistance severely prejudiced the outcome of the trial." The State responds that the petitioner "prove[d] neither that trial counsel performed deficiently nor that any deficiency caused prejudice." We agree with the State.

The petitioner bears the burden of proving his post-conviction factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). The findings of fact established at a post-conviction evidentiary hearing are conclusive on appeal unless the evidence preponderates against them. *Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). This Court will not reweigh or reevaluate evidence of purely factual issues. *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, appellate review of a trial court's application of the law to the facts is *de novo,* with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel presents mixed questions of fact and law. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Thus, this Court reviews the petitioner's post-conviction allegations *de novo,* affording a presumption of correctness only to the post-conviction court's findings of fact. *Id*.; *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. In order for a post-conviction petitioner to succeed, both prongs of the *Strickland* test must be satisfied. *Id.* Thus, courts are not required to even "address both

components of the inquiry if the defendant makes an insufficient showing on one." *Id*.; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

A petitioner proves a deficiency by showing "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the *Strickland* test is satisfied when the petitioner shows there is a reasonable probability, or "a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

## I. Preparation for Trial

The petitioner argues that counsel rendered ineffective assistance by failing to effectively communicate and prepare for trial and demonstrating a "lackadaisical approach" to his case. The post-conviction court did not specifically address this issue, perhaps due to the unclear manner in which it was raised, but nevertheless, the record does not support the petitioner's assertions. Although counsel could not recall the number of times she met with the petitioner to discuss the case, she knew they met "on more than one occasion" in her office and also possibly in the jail. Additionally, they met every time "there was a court date" and "met every day" during trial. The petitioner recalled meeting with counsel twice at her office and once at the jail when he was temporarily reincarcerated. Counsel testified that she provided the petitioner with discovery and that during their conversations, she and the petitioner "discussed all the evidence," particularly the evidence that was "problematic" for the petitioner's case. The most problematic evidence was the petitioner's confession, which counsel sought unsuccessfully to have suppressed. Counsel and the petitioner also discussed the co-defendants. The record shows that counsel engaged in adequate communication with the petitioner throughout her representation and was prepared for trial.

Moreover, despite the petitioner's contention that counsel's failure to communicate led to a "further lack of investigatory material," the petitioner has not identified any specific issues that counsel failed to investigate or proof that would have arisen from such investigation. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) ("When

- 11 -

a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing."); *Jackson v. State*, 2021 WL 1733369, at \*4 (Tenn. Crim. App. May 3, 2021) ("Although the petitioner argued that counsel should have investigated the case more, he did not present any evidence that trial counsel would have uncovered with more investigation."), *perm. app. denied* (Tenn. Sept. 22, 2021). Counsel did not perform deficiently, and the petitioner has not established prejudice.

Included within this issue is a critique of counsel's handling of the petitioner's statement to police. The petitioner suggests that counsel was deficient because she "made no attempt to diminish the effect of [the petitioner]'s statement on the jury." He asserts that even though the trial court denied the motion to suppress, counsel should have presented "evidence to challenge the veracity or weight" of the statement.[1] The record shows that counsel performed within the wide bounds of reasonable professional assistance with regard to the statement. After the State introduced the statement, counsel thoroughly cross-examined Detective Carlton and established that the petitioner asked about speaking to his attorney and that his attorney was not present when he gave the statement. Counsel's questioning also suggested that the petitioner did not know where he and his co-defendants were going, and that the petitioner told the detective that he never entered the victims' home and did not actively participate in the crimes. The petitioner, therefore, has failed to prove counsel performed deficiently.

Along with his complaint about counsel's handling of his statement, the petitioner asserts that counsel "essentially conceded defeat" and "failed to even attempt to develop any strategy at all." The record indicates otherwise. Through her cross-examinations and closing argument, counsel put forth the theory that the petitioner was not present given the inconsistent proof of whether there were three or four perpetrators, and the petitioner supposedly knowing individuals in the home but not being identified by any of them. In the alternative, counsel posited that if there were four perpetrators, the petitioner remained at the front door of the home and did not actively participate, consistent with some testimony that one perpetrator did not go inside. These were reasonable defense strategies, and the petitioner has not suggested what other strategy counsel should have pursued. Accordingly, the petitioner failed to meet the burden required of him and, therefore, is not entitled to relief.

---

[1]To the extent the petitioner argues that his statement should have been suppressed, such has already been ruled on by this Court on direct appeal. *Banks*, 2020 WL 5015888, at \*7-9.

## II. Juror Issue

The petitioner also argues counsel rendered ineffective assistance by failing to remove a "clearly biased" juror with whom the petitioner had a previous conflict. During voir dire, Mr. Gonzalez readily admitted that he and the petitioner went to school together, clarifying "middle school . . . [l]ike, a year in school." Mr. Gonzalez said that he had not had much contact with the petitioner since then and felt he could be a fair and impartial juror.

The petitioner testified at the evidentiary hearing that he and Mr. Gonzalez were friends in school and "kind of had a bad falling out." The petitioner asserted that he told counsel his concerns and that he wanted to strike Mr. Gonzalez, but counsel told him not to "waste one of your picks taking him off, because the D.A. is going to take him off." In contrast, counsel testified that she and the petitioner discussed the situation and that the petitioner did not want to strike Mr. Gonzalez. Counsel recalled that the petitioner, in fact, told counsel that he "preferred to leave Mr. Gonzalez on the jury" and "thought that it would, actually, be a positive" to have a similarly aged young male on the jury. Counsel did not think their prior relationship would taint the jury because, by all accounts, it appeared to be "a friendly relationship." Counsel reiterated that she would "have had a problem" with keeping Mr. Gonzalez on the jury if the petitioner had told her that they did not have a good relationship.

In ruling on this issue, the post-conviction implicitly accredited counsel's testimony and found that "the decision to allow Mr. Gonzalez to remain on the jury does not constitute ineffective assistance of counsel." The court noted that "incompetent representation has not occurred merely because other lawyers, judging from hindsight, could have made a better choice of tactics." The court also observed that aside from the petitioner's own testimony and a photograph of the petitioner, Mr. Gonzalez, and a female together while they were in middle school, there was "[n]o other proof" presented by the petitioner suggesting "any other basis for removal of Mr. Gonzalez."

The record shows that, upon consultation with the petitioner, counsel made an informed strategic decision not to strike Mr. Gonzalez, and such decision does not constitute deficient performance. Moreover, aside from a photograph showing that the young men knew each other, the petitioner failed to offer any proof that Mr. Gonzalez was biased against him, or present Mr. Gonzalez as a witness at the evidentiary hearing in an effort to show that he was biased. *See Black*, 794 S.W.2d at 757. As such, the petitioner has failed to prove he was prejudiced by Mr. Gonzalez being on the jury.

## III. Cumulative Effect

The petitioner lastly invokes the cumulative error doctrine, asserting that "[d]ue to the myriad of errors caused by [counsel]'s failure to communicate with [the petitioner], failure to investigate the case, failure to strike a biased juror, and failure to present appropriate defenses at trial, [the petitioner] has been severely prejudiced by [counsel's] ineffective assistance of counsel." However, in the post-conviction context, "a petitioner cannot successfully claim he was prejudiced by counsel's cumulative error when the petitioner failed to show counsel's performance was deficient." *Gooch v. State*, 2015 WL 498724, at *10 (Tenn. Crim. App. Feb. 4, 2015) (citations omitted). As we have addressed separately above, the petitioner has not shown that counsel rendered deficient performance, and he is, therefore, not entitled to relief under the cumulative error doctrine.

### *Conclusion*

Based on the foregoing authorities and reasoning, the judgment of the post-conviction court is affirmed.

_____
J. ROSS DYER, JUDGE